at all or arguments not to exceed 15 minutes per side. Mr. Christopher Patrick Desmond for Plaintiff Appellant. Good morning, Your Honors. Christopher Desmond on behalf of the Plaintiff Appellant. The estate of Mr. Illuminato Lopez. Your Honors, if you will, I'd like to have three minutes of rebuttal time. You may. So I'm going to start today, Your Honors, with a point that oftentimes I think I don't generally necessarily reference because it seems so basic in the context of a 1983 case and that's the standard of review. I think that this case and this dispute, especially when you look at the briefings of the parties, it really comes down to the issue of whether or not this trial court properly applied the standard of review and truly viewed the evidence in the light most favorable to the plaintiff, the non-moving party. There have been some recent opinions from two of the panel members here today regarding this issue of the importance of the standard of review in a 1983 case. Judge Boggs, you recently had the opinion in Baker v. Union Township where you specifically said that the second that the parties begin to argue the facts in an excessive force case, a court is essentially divested of jurisdiction to hear the case and that that's an indication that the matter needs to proceed to trial. Judge Boggs and Judge Donald, you were both just on the Marguson v. White County case together where, again, there was a dispute from the parties regarding the facts and specifically regarding whether or not an individual was on the ground after he was being shot by the police officers, which is a factor that we have present today. But in those cases, perhaps, I'm not acquainted with either one of those cases, there was a dispute regarding facts. This particular judge said there are disputes regarding facts, but I'm going to take the facts and this is the way he has to do it or she has to do it in the light most favorable to the party opposing the motion. Now, what facts did he take into account that were different from those that he said he took into account? I think the one that immediately jumps out to me where he contradicted his statement that he was going to take the evidence in the light most favorable to my client was when he stated that my client was not shot while he was on the ground or if he was shot while he was on the ground, it was because there was simply a rapid succession of shots and that the shooting continued as he fell to the ground and he was shot while he was on the ground. That simply isn't supported by the record. If you look at the testimony of Miss Adelaida Plah, who was the individual who was the closest to Illuminato Lopez when he was shot, her testimony is very clear regarding the point that she's stating to the police officers, he's my brother, I'm going to get this machete. She says that her brother stated to her, come get the machete from me. As she's approaching, she says that he shot once, he takes that shot, he falls to the ground. She then, according to her testimony, has enough time to say to officers, stop shooting him, he's not going to hurt anybody. She says they then continue with a second series of shots. Now, when you look at the trial court's opinion, the trial court says that A, he doesn't think that that happened and he cites to what defense counsel cited to, which is their expert's opinion regarding an audio tape that he reviewed. Now, he's not an audio expert, I don't believe, and the court wasn't relying on the actual audio tape. The court is relying on an expert saying, I heard a tape and based on what I heard in this tape, it sounded like all of the shots were in a quick succession. Now, we don't have anyone necessarily in this record confirming that that tape is accurate, that the shots that you can hear recorded in that tape are the only shots that occurred that day, but what we do have is a witness indicating that they're shooting him while he's on the ground and after I'm telling them to stop. Now, before we even get to the shooting though, didn't they attempt to tase him once or twice and he took action to sever the taser wires? He did take action to sever the taser wires. And did that happen before or after Miss Plah was invited, allegedly, to come and get the machete? That was before Miss Plah was invited to come get the machete. And so from the reasonable officer's standpoint, how can you say that they were able to or should reasonably have believed or even heard Miss Plah, the interchange between Miss Plah and Mr. Lopez, right? Well, we know that in terms of whether or not they... Because they said they never heard that. They say they didn't. And yeah, they certainly say they didn't. Now, we know that Miss Plah says she's speaking directly to the officers when she's saying it. We know that Satish Concepcion, who was a non-police officer who was present at the scene, says that she could clearly hear it and she's not standing immediately next to Miss Plah. And then in a different portion of the scene, we have two other witnesses. We have, I believe it's Melba Cartagena and Noel Cartagena, who both also testify that they can clearly hear Adelaida Plah informing the police officers, don't hurt him, he's my brother. They also testify... This is the conversation before the shooting. This is when she says, he's going to give me the machete or I'm going to get the machete? Correct, Your Honor. And to be fair, Your Honor, I think it encapsulates that portion of the conversation, but also the moments leading up to that conversation. Because based on Miss Plah's description, this isn't just she says one time, he's my brother, I'm going to get the machete. This is happening over a prolonged period of time. In fact, to the point where Miss Plah testifies that she's initially urging the police officers, don't hurt him, he's my brother. She says the police officers aren't listening and she gets frustrated and walks away from the scene. She actually leaves the scene to approach a home. She's then called back by her brother. So this is happening over a fairly prolonged, relatively prolonged period of time. But we have all of these individuals, Judge Genel, just to answer your question, who have all testified that they could hear what Miss Plah was saying. Now the officers have denied it, but this court has said several times, and most recently, Judge Sutton wrote a published opinion in a case that I was here on in December, an excessive force case, where he said, if the officers contend they acted reasonably, we don't simply call off the trial. That's one factor for a jury to consider. And a jury might find the officers to be credible when they say we didn't hear it. But they might also say, well, if all these other witnesses are at the scene are testifying that they clearly could hear it, and the officers are standing in the exact same area, maybe they did hear it and they're not being truthful. I want to go back to the initial encounter. When the officers arrived on the scene, Mr. Lopez was in the street correctly. I mean, correct? Correct. With the machete. Who got him up? Well, first of all, there is some dispute regarding whether or not he had a machete when the officers arrived. I believe two witnesses have testified that he didn't have the machete when the officers arrived. Others have testified that the machete was in his hand. And to be fair, two of the non-police officers have testified he had the machete in his hand. So I'm not saying that the full weight of the evidence leads to the fact that he didn't have the machete. But there is some dispute in the record regarding that point. What I was asking, though, is if he was in the street, did the police get him up? Did some of the non-police officers get him up? Did he get up on his own and then start to approach the officers? No, I believe he stood up on his own will. I believe the officers approached him. And I think the testimony is that the officers approached him. I don't know if it was the first two officers that arrived. That was Officers Milner and Schramm. I don't know how close they approached him at first. But I do know that the testimony ultimately leads to the fact that Mr. Lopez is standing up and there's a semicircle of seven officers standing around him. Those officers have placed themselves at a distance of 15 feet from him. Which is an interesting distance because much of the argument that was made below in particular was about this idea of the zone of danger. And that if you're within 21 feet of someone that has a stabbing or slashing weapon, that you're no longer safe as an officer. Well, if they choose to put themselves within that 21 foot zone, I don't know how they can then... But now they're not really claiming danger to themselves as the reason for shooting, as I understand it. Well, when you look at the aggregate description of the facts, they're not. The aggregate description sort of comes down on the side of what we were trying to protect, what they describe as an unknown woman. Now, again, all of the non-police officers are saying they knew who she was. Or at least they knew who she said she was. Right. But there's a discrepancy between some of the officers. For example, Officer Tankersley, the individual who has a rather interesting history at the Cleveland Police Department. He's testified that Mr. Lopez had turned towards Ms. Plah as she's approaching him, that he had raised the machete and that he was actually swinging the machete towards her or making a swinging motion with the machete. Now, other officers, I believe it's Officer D'Agenti, says that he never makes any movement towards Ms. Plah. So there's certainly a discrepancy, I believe, between several... Well, they cite, I mean, I was about to ask you essentially, what's the least movement that a witness says? And at page 14 of their brief, they cite D'Agenti as saying that the decedent turns toward Plah with the machete. Yeah, and I think that's a pretty... That's not quite what you just said, which was he didn't make any movement at all. I meant to imply no movement with the machete, Your Honor, because one of the facts that I think is material to this and that defendants disagree on is what the position of the machete was. Because we have some people saying that the machete is raised in the air. Sure, but that at least I would take, and I think at some points even they would say that's a disputed fact. Two questions. Is it clear which hand he has the machete in, right or left? The sister's to the right. Is it clear whether he has the machete in the right hand or the left hand? You know, to be honest, Your Honor, I can't tell you that. All right, passing that because I didn't find it either. Yeah. I'm sorry. Go ahead. The least... Tell me if you think this is right or not. The least movement that I can see that anybody says is something like turned toward her, which could be turned the feet or just turned the body, but almost everybody says that he wasn't standing stock still. Is that fair? I'd say that that's fair. I'd say that I don't believe any witnesses would say that he's standing, to use your phrase, stock still. There's differences regarding whether he turned his body towards her, whether he raised it, whether he didn't, if he raised it while he was looking. From your point of view, you would have to say that the view of the evidence most favorable is that he turned at least in the sense of turning his upper body. Is that fair? I'd say that that is probably fair, Your Honor. Let Judge Donald ask her question. I just wanted to say, in fact, in this witness list, when you look at the officers and the non-officers, eight of the 10 witnesses testified that he raised a machete over his head, and eight of the 10 witnesses, not the same eight, indicated that he turned or pivoted toward Miss Adelaida. So is taking that in the light most favorable to the movement, wouldn't you have to say that the judge's characterization and ultimate conclusion is sort of reasonable? No, Your Honor, absolutely not. I'd say there's a difference, first of all, between characterization and conclusion. Now, characterization of evidence is one thing. Conclusion, based on that characterization, is another. So characterization is going to lead you to probably a conclusion. Well, Your Honor, I think the conclusion is, and this is the conclusion, and it's because they have no other choice, the conclusion that the defendants have to advance is that if an individual is armed with a machete and is refusing to drop that machete, if he makes any movement towards someone, you have reason. And again, any movement, not a threatening movement, if he just simply repositions his body, that that is grounds, constitutional grounds, to shoot somebody. And I don't think that there's any case law in support of that position. The case law regarding stabbing cases or cases of, for example, they cite the Chappell case, and the Chappell case or the Chappell case, I've never known how it was pronounced, the individual jumps out of a closet with a knife and is running towards the officers in a confined space. Now, this isn't that case. This isn't a case where somebody is currently in the process of making a threatening movement, if you view the evidence in the light most favorable to us, particularly if you accept that the officers here... I think I understand your position and your light's on, so... I was going to say, unless my colleagues have any further questions, you have your three minutes for rebuttal. Thank you, Your Honor. Good morning to the panel, counsel, staff, and everybody observing us today. My name is John P. Bacevice, Jr. If you meet me socially, please call me Jack. I'm an assistant law director with the city of Cleveland. I'd also like to acknowledge Sean Malamud. He's representing the city of Cleveland and is an assistant law director with the city of Cleveland. If I may, the first thing I'd like to correct from the earlier beginning of the arguments is that the district court judge, Judge Gaughan, is a she. And I think she would appreciate me pointing that out. She was referred to as a he earlier this morning. Well-settled law is that when looking at these 1983 cases, we must look at them from the perspective of a reasonable officer at the time, given what the officers knew. Mr. Desmond just stated that he believes what we're advancing is this idea that if somebody is holding a machete and they make any sort of movement, it's shooting them. Deadly force is justified. That's not what we're advancing. We're advancing that in the context of this case, where you have to look at the totality of the circumstances that the officers knew, it was justified. Here's the totality of the circumstances. First, the officers were called to a domestic violence dispute. Mr. Lopez was using a baseball bat to bash out windows of his nephew's car. Upon arriving on the scene, Mr. Lopez was sitting in the street with a bottle of beer, indicating there may be some sort of intoxication issue, which would be an aggravating factor, something that they would have to deal with. And there was a machete. Now, there is dispute whether or not the machete was in Mr. Lopez's hand at the time or whether it was on the ground. But even those witnesses who state that the machete was on the ground admit that when he got up, the machete was now in his hand. So at this point in time, what we have is an armed suspect who is suspected of committing a violent crime with a deadly weapon in hand. The officers command that he drops the weapon. This is a lawful command. He does not do it. They call for backup. More officers arrive. They use less lethal force. They use tasers. I believe they fired their tasers three times. I'm not certain on that. No doubt the record will clear that up. They were ineffective. Not only were they ineffective, but Mr. Lopez responded with aggression. He used the machete now to cut the taser wires. There were a number of people around. This is a dangerous situation, and the officers not only have to worry about their own safety, but also all of the members of the public. They don't know who any of these people are. They may be stating, I'm his sister, I know him, he's not dangerous, he has mental illness, all that stuff. But people say all kinds of things to police officers in the heat of the moment. They don't have to, nor should they, accept them all as truth. They have to go on their experience, and they have to go on what they are seeing. So at this point, they've seen a dangerous man, armed, already called for being violent. That's why they're responding. Not complying. No problem using the machete. Maybe intoxicated. And everybody's shouting around. Now, there are some minor disputed facts in there. But these are the facts that matter, and they are not in dispute. Let me stop you. I knew someone was going to stop me. A lot of times in these cases, in the law, is you have to look at it segment by segment. And usually, it's the officers that are talking about that because something's happening that they're reacting to a certain situation. Here, you segment it. This is potentially a bad guy. It's potentially a bad situation. But the shooting happens at a time when the officers are not saying he's a danger to them. They're out at some distance, and they're watching this happen. And even if you call it an unidentified female, we have to take the facts that at least the woman has said things that they have heard about why she's approaching him. Is that fair to this point? It's fair, Your Honor, but I'd like to point out. Let's answer my question. To that extent, it's fair. So we have to segment at that point when she's approaching, what is it that justifies shooting him at that point, right? It's the movement, Your Honor. Okay, and that gets us to, is it a correct statement of the law that any movement or the turning of the upper body, unless you want to fight about that, is that enough to justify shooting? That would be a question of law, okay? Your Honor, when looking at 1983 cases, the courts, including the Supreme Court, have been very clear that you have to make a particularized assessment of each case. Counsel, we don't have much time. Let me let Judge Quist ask his question because I cut him off, and then you can answer both. Yes, sir. I was just going to ask, when I asked your counsel here, Mr. Desmond, what fact would make a difference from those found by the district court? He said, well, they shot him while he was on the ground. Is that an important fact? In other words, shooting him once brings him down, and then he lies there and they shoot him a few more times. Well, your Honor, as Mr. Desmond... He says that that is the only thing that he pointed out. He might have had others in his mind. That's the only thing he pointed out that made a difference. Well, Mr. Desmond stated that it wasn't just that he was on the ground, but that there was a period of time where apparently Ms. Plah testified she was able to speak. She was able to tell them to stop shooting. So I think that if that were perhaps the situation, it may be different. But we have evidence. There is a recording that shows that it was just continuous shots. Now, I'm going a little off the cuff here, but I believe it's Scott v. Harris from the United States Supreme Court. And it states that when there was a recording, and I believe Scott v. Harris was a video in question, but we've used Scott v. Harris other times for audio, for other photographs, that sort of thing, that contradict testimony. Was the tape introduced? Your adversary seemed to say there was simply someone who said he had heard the tape who said something. Is that correct? Was the tape in evidence? I can't say for sure, Your Honor, because I did not have it at the district court level. You both have read the record. I know, and I just don't know. I just don't know, and I don't want to make a mistake. However, when that sort of evidence is relied upon, it is the party that is not using it that has to challenge the evidence. Is there a correlation between how many shots are heard on the tape and how many shots were fired? I believe so, Your Honor. I believe it's very quick. No, no, counsel, number. Number. Eight shots. Eight shots, and that is based on the evidence of the firearms or the evidence of the tape? I believe both. I believe the evidence of the tape corroborates that there were eight shots, and I believe it initially comes from what is counting the rounds fired, because everyone knows how many rounds everyone had in their… Testified to that? I believe all the individual officers were able to testify to how many rounds they fired. And that added up to eight? Yes, sir. And that's the same as the tape? I believe so, sir, yes. Counsel, if there is a contradiction between the forensic evidence regarding Mr. Lopez's wounds and positioning when those shots were fired and the witness accounts of the shooting, is that something that probably should be heard by the jury? Are you referring to the idea of it being a contact wound, Your Honor? Being a what? A contact wound. Well, not only that, but the positioning of the wounds would also determine whether or not, you know, for example, his hands were over his head or those kind of things. Well, hands over the head… Let me just finish. I'm sorry, Your Honor. I'm just talking about any discrepancies between the forensic examination and witness accounts. Well, I would say no if all the witness accounts are in agreement. I would say that a non-fact witness, someone who was not there, can't overcome when the statements of everybody who was there are in agreement. So science is less accurate than eyewitness accounts? I don't think that's what I was saying, Your Honor. I think that what we're doing here… I asked you about forensics, which would be the science. Well, and forensics are imperfect. I mean, they get things close. And witness accounts are imperfect, right? That's true, Your Honor. How does your statement square with Curitin, where the officers… I think you cite that. Someone cites it. I wrote it. I was on it, so I know about it. Where the officers, who are the only survivors, say one thing, and the forensic examiner says about where he's holding the gun. Ah, yes, Curitin versus Brandenburg. Well, I believe in our brief, when we distinguish it, because I believe Mr. Desmond is the one who cited it, the distinguishing factor is the difference between a gun and a bladed weapon. In Curitin… But with respect to Judge Donald's question, you have us, the court, allowing the case to go to the jury based on the fact that the forensics say one thing, even though the officers say another, and your proposition was that you always believe the witnesses over the forensics. Well, Your Honor, I may have gotten a little bit away from myself as I was addressing Judge Donald's question. If I can get back to this matter, I believe the context you were asking, Judge Donald, is whether the forensics state that the machete was perhaps above his head or down by his side. With a bladed weapon, it doesn't need to necessarily be over someone's head to kill someone, nor by their side. Anytime you have a bladed weapon in your hand, you can use it to attack somebody. That's not what I said. I was asking you about if there's a contradiction between what the forensics say about the entry-exit wounds, about what was going on with Mr. Lopez, and the witness accounts. All I'm asking is if there's a contradiction. Is that the kind of material issue that should permit this case to be heard by a jury? I don't think so. Okay. Assuming that they shot him while he was already down, would that make a difference in the outcome? I suppose your answer would be no. But if it isn't, tell me. And if it is no, tell us why not. Because it was a rapid-fire succession of shots. And, you know, shooting, pulling a trigger is instantaneous. So it was just the officers reacting one, two, three seconds. I mean, they don't necessarily realize he's down. He still has the weapon in his hands. They don't know that he's incapacitated. They do know that there's a person approaching him within a distance where she could be harmed instantly, immediately. So it's because it was such a quick reaction, such an immediate reaction, where I think it does not make a difference in this matter. Counsel, in talking about what the district court says, the district court does lay out the previous, you might say, the run-up, which you gave us eloquently at the beginning, about the baseball bat and resisting arrests, ignored officers. But then, to me, this is the crucial statement or finding, which is in a sense a statement of law. In light of his earlier refusals to drop the machete, any potential movement by him, whether or not directed at himself or her, could be viewed as requiring the use of deadly force. Would you agree that that's the ultimate legal conclusion here? I agree that, as the district court wrote the opinion, that's the ultimate legal conclusion. You think that's a correct statement of law? Yes, and I think that the district court did not go far enough in stating that it was merely the refusal to drop the machete. I think all of the factors that I enumerated in the beginning. No, she lays out that, but the part that in this type of situation, any potential movement, whether directed even at yourself, could be viewed as requiring the use of deadly force. I mean, essentially, I think one of you cited, I don't know if you do cite the Sova case, where essentially the officer said, well, we had to kill him to keep him from committing suicide. We did not buy that in Sova versus City of Mount Pleasant. Well, Your Honor, what I have to say is the idea of any potential movement even towards himself, there's no way of knowing that his intent would have been to harm himself until he had already harmed himself. There's no way of knowing what's in his mind. So once a movement starts, even if that movement was to bring up to slash his own throat, there's no way to know that until he's already slashed his own throat. We should agree that there's a dispute of fact as to whether the machete is ever raised or moved at the segmented time. I got your adversary to agree that he made a movement at least of turning the upper body. Do you go further than that and say it's undisputed that, for example, he stepped toward her or that he raised the machete? No, Your Honor, I agree with what you brought to earlier with your client. I was merely using that as an example, just as an example. That's not what happened, yeah. No, no, but I was just using it as an example to explain why you cannot know the intent of the person when they raise that weapon until they've already harmed themselves. That's the only way they would know with certainty that his intent was to harm himself. It's something where it's impossible. It's temporally impossible for them to have made that determination that, oh, he was raising it to harm himself. Now, if there was nobody else in the area, if there was one person and all the officers were 30 feet away in a completely desolate area, then yes. Perhaps then you could say, if he raises it, the only possibility is to harm himself. But you couldn't say that here as there was a person approaching him. And although she certainly had good intentions, this was her brother. She wanted to diffuse the situation. Citizens don't get to just assert themselves into police situations like that. They never said stop, go back, leave him alone, right? I mean, they don't even testify to that. I don't know, Your Honor. I don't know, but I think that any person, any reasonable person would know, any citizen of the United States would know that when there's a police situation, you do not interject yourself into it in a dangerous police situation. Is there law that supports that statement? Do we need law for that common sense, Your Honor? Well, I would think maybe we do in terms of it's not always going to... I'm not sure I would agree with that. When you say interject yourself, yes, anybody knows you shouldn't shove the police around. But saying he's my brother, I'm going to calm him down, I'm not sure that that's something that every citizen of the U.S. would know it didn't happen. Let me ask my colleagues any further on your part. Thank you, Counsel. I'd just like to thank everybody. It's always a great honor for me to argue in this court. Okay. All right, you have your three minutes for rebuttal, Mr. Desmond. And if you have anything to say about the tape and the shot count that I asked your adversary, I'd be interested. Well, Your Honor, what I would start off by saying is look to the opinion. If you look to the trial court's opinion, the trial court cites to the exact same thing that defense counsel cited to in their brief in support of their motion for summary judgment, which is simply the report of their law enforcement expert. So the court never says, I listened to this audio tape and I heard that the number of shots that the officers, forensics, you know, confirmed they took, that all those shots are accounted for on this tape and they all happened in rapid succession. Was the tape something that would have been available to your side? I know that I haven't heard an audio tape. Well, that's not the same as that. You could have asked for it. Right, yeah, we could have asked for it. I don't know if it was asked for or not. I'm certain that it was asked for. I know that that's something that our office would do and, you know, in our normal custom would be to ask for any tapes. You can't cite me to the record? I can't cite you to any portion of the record where it was admitted. No, but can you cite me to any portion of the record where you asked for it? Because those are record documents. No, I can't do that, Your Honor. I can't do that. And part of the reason, you know, while I, you know, regret telling you that I can't do that, part of the reason why I can't do that is because this is an evidence that we relied on in support of our response because they never produced the tape to the court in support of their motion. They simply cited to their expert's interpretation of an audio tape that the court, if the court, all I would say is this, Your Honor, if the court felt that the contents of that audio tape were important enough and were credible enough to justify a grant of summary judgment in this case, the court should have taken the time to ensure that it actually heard it. Go on to your other points. In terms of this idea of Ms. Plah's approach necessitating force, what I would say about that is if simply approaching an officer justified or approaching an armed citizen justifies the use of force, don't let her approach. There are eight officers at this scene, and again, maybe a jury won't believe her, but Ms. Plah clearly testifies that she tells these officers, I'm going to approach him to get the machete, and she testifies that he yells to her, come get the machete from me. Now, they might not believe that, but if the fact is, as her testimony indicates, that that is what happened on this day, and eight officers stand around and don't do anything to stop her from approaching and don't say, hey, that's not a good idea to approach, and then allow her to approach and use that approach as a justification for the shot, I don't know if you can say that that's the conduct of a reasonable officer that entitles an officer to qualified immunity. Judge Donald, very quickly with regard to your questions regarding forensics, the statement was made that forensics are uncertain. That sounds a whole lot to me like plaintiff's expert or plaintiff's evidence is incredible. We're arguing facts. That's not what we're supposed to be doing at this stage. Now, they might want to contend that those facts aren't material to this shooting, but our experts certainly say they are. Our law enforcement expert, Ken Katsaris, says it's certainly important whether or not that machete was raised in the air. Counsel, I think Judge Quist has a question. I apologize, Judge Quist. Just to the point I wanted to make. Oh, I'm sorry. What is the importance of the machete being raised into the air? A machete is a slashing instrument. It's not like a stabbing instrument. In other words, the machete is more dangerous if you hold it down than if you hold it up. So why is that so important to you? Well, it's important to me. If I had a machete and I wanted to start here and I go like that, that's what a machete is used for, for cutting, you know. Yeah, I guess I'd have to take your word on that, Your Honor. I don't. Well, I. Yeah. What I would say is that these officers, by their testimony, they made the position of the machete important. And so if we're going to talk about what a reasonable officer at the scene would think, when these officers are talking about in their testimony why their conduct was reasonable, some of them are referencing, like Tankersley, for example, is referencing, we had to shoot because he's swinging the machete at someone. Others testified we had to shoot because he's raising this machete in the air. They're indicating that the positioning of the machete dictates to them whether or not they're confronted with a threatening situation. So I would argue that when they can't agree amongst themselves and when the other eyewitnesses at the scene can't agree on what that important positioning of the machete was, this is something that has to be presented to a jury. I guess we would all agree, then, that machete is pretty dangerous if it's up or if it's down. In other words, it doesn't make any difference. Well, I don't know if I would necessarily agree with that, Your Honor. I do think that there's evidence that in terms of the idea of the machete being up, there was some testimony that as he's raising it, he's testifying he's about to use it to stab himself, which, as you noted, Judge Boggs, goes to the illogical conclusion of, well, let's kill you before you kill yourself because we're allowed to do that constitutionally, apparently. Well, the raising could be evidence of intent as opposed to dangerousness. So we'll have to look at all of that. Thank you, Count. Thank you, Your Honors. I appreciate it very much. The case will be submitted. The clerk may call the next case.